| | | |
|---|---|---|
| Z.G., by and through his<br>mother and next friend, C.G.,<br>C.G., on behalf of herself, and<br>J.G., on behalf of himself, | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) <br> ) | |
| v. | ) <br> ) | **ORDER** |
| PAMLICO COUNTY PUBLIC<br>SCHOOLS BOARD OF EDUCATION,<br>LISA JACKSON, Superintendent, in her<br>official capacity, CHRIS DAVIS, Pamlico<br>County Sheriff, in his official capacity,<br>and DEPUTY BAILEY, in his official<br>capacity, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

On November 17, 2015, Z.G., a minor child acting by and through his mother C.G., Z.G.'s

mother C.G., and Z.G.'s father J.G., (collectively, "plaintiffs") filed a complaint against the Pamlico

County Public Schools Board of Education ("the Board") and Superintendent Lisa Jackson

("Jackson") in her official capacity [D.E. 1].[1] On April 29, 2016, plaintiffs filed their first amended

complaint, which added Pamlico County Sheriff Chris Davis ("Davis") and a "Deputy Bailey" as

---

[1] Under Federal Rule of Civil Procedure 5.2(a)(3), the name of a minor must be limited to
the minor's initials unless the court orders otherwise. Federal law further protects a student's
personally identifiable information. 20 U.S.C. § 1417(c); 34 C.F.R. §§ 300.32, 300.610. Because
the protection of a minor's anonymity "would be eviscerated unless the parent was also permitted
to proceed using initials," and because defendants' will not be prejudiced by the use of the parents'
initials in court filings, the court will address all plaintiffs by their initials. P.M. v. Evans-Brant
Cent. Sch. Dist., No. 08-CV-168A, 2008 WL 4379490, at *4 (W.D.N.Y. Sept. 22, 2008)
(unpublished); see Eley v. Dist. of Columbia, No. 16-cv-806 (BAH/GMH), 2016 WL 6267951, at
*2 (D.D.C. Oct. 25, 2016) (unpublished); Z.A. v. N.Y. City Dep't of Educ., No. 15 Civ. 1539 (KPF),
2016 WL 4766340, at *1 n.1 (S.D.N.Y. Sept. 13, 2016) (unpublished).

defendants in their official capacities, along with the Board and Jackson (collectively, "defendants") [D.E. 25]. The first amended complaint alleges that defendants are liable to plaintiffs under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. § 1400, et seq. ("IDEA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et seq. ("section 504"), the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), 42 U.S.C. § 1983 ("section 1983"), and state tort law.

On May 13, 2016, the Board and Jackson moved to dismiss the first amended complaint for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state a claim [D.E. 28] and filed a memorandum in support [D.E. 29]. On June 2, 2016, plaintiffs responded in opposition [D.E. 34]. On June 13, 2016, the Board and Jackson replied [D.E. 35]. On June 20, 2016, Davis moved to dismiss the first amended complaint [D.E. 36] and filed a memorandum in support [D.E. 37]. On June 28, 2016, plaintiffs responded to the Board and Jackson's reply [D.E. 38].

On July 6, 2016, the Board and Jackson moved to strike plaintiffs' response to their reply [D.E. 39] and filed a memorandum in support [D.E. 40]. On July 7, 2016, plaintiffs moved for leave to amend their complaint a second time [D.E. 41]. On July 11, 2016, Davis responded in opposition to plaintiffs' motion to file a second amended complaint [D.E. 42]. On July 26, 2016, plaintiffs responded in opposition to the motion to strike their response brief [D.E. 43]. On July 28, 2016, the Board and Jackson responded in opposition to plaintiffs' motion to file a second amended complaint [D.E. 44]. On August 9, 2016, the Board and Jackson replied to plaintiffs' response regarding the motion to strike [D.E. 45].

As explained below, the court grants the Board and Jackson's motion to strike, denies plaintiffs' motion to amend as futile, and grants defendants' motions to dismiss the first amended complaint.

2

I.

Z.G. is a six-year-old boy who resides with his mother C.G., his father J.G., and two siblings in Merritt, North Carolina. Am. Compl. [D.E. 25] ¶¶ 4–6, 12. Z.G. has been diagnosed with numerous conditions that affect his participation in educational activities, including Attention Deficit Hyperactivity Disorder and Autism Spectrum Disorder. Id. ¶ 15.

Pamlico County Public Schools Board of Education ("the Board") is an agency of the State of North Carolina that operates the public schools in Pamlico County, North Carolina. Id. ¶ 7. The Board operates programs that receive federal financial assistance. Id. ¶ 9. Jackson is the Superintendent of Pamlico County Public Schools, and resides in Pamlico County, North Carolina. Id. ¶ 8. Davis is the Sheriff of Pamlico County and leads the Pamlico County Sheriff's Office, which employs "Deputy Bailey." Id. ¶ 10.

In January 2015, Z.G. enrolled in Pamlico County Primary School ("PCPS") after "a local public charter school [was] ill equipped to meet his special educational needs." Id. ¶ 13. When Z.G. began attending PCPS, J.G. told the school's principal, Principal Potter, about "educational and disciplinary issues Z.G. had while attending the public charter school." Id. ¶ 18. Principal Potter said she would help identify Z.G.'s eligibility for programs under Section 504 of the Rehabilitation Act. Id. ¶ 19. Principal Potter told J.G. that Z.G. could ride the "Exceptional Children's" bus, a school bus designated for students with special needs, and said that Z.G.'s parents would have to pay for a psychological evaluation to demonstrate Z.G.'s eligibility for special educational services. Id. ¶¶ 20–21, 38.

Z.G. continued to attend kindergarten at PCPS. Id. ¶ 23. Throughout the year, Z.G. "would have incidents where his behaviors in the classroom" required Principal Potter to remove Z.G. from class. Id. Z.G. would spend most days in Principal Potter's office where he received little education.

3

Id. ¶¶ 23–25.

At some point before April 2, 2015, C.G. "signed a referral form for special education services and provided it to the school." Id. ¶ 35. On April 2, 2015, Julie Rowe, the psychologist Z.G.'s parents retained to evaluate Z.G.'s eligibility for special educational services, sent a "preliminary report" to PCPS, recommending that the school "provide Z.G. with a '504 plan' to address Z.G.'s 'behavioral pattern of having outburst[s] to go home.'" Id. ¶ 28. Julie Rowe's report stated that Z.G. presented numerous symptoms "commonly seen in Aspbergers children," and recommended that Z.G. have access to an "ECP room as a way to manage his outbursts but also an alternative classroom placement if the activities of the regular classroom . . . are just too over stimulating for him." Id. ¶ 29–30. Around the same time that Julie Rowe sent her preliminary report, Z.G.'s classroom teacher submitted a "Section 504 Teacher Referral Form," noting that Z.G. was intelligent but repeatedly engaged in disruptive behaviors that "impede[d] his ability to learn." Id. ¶¶ 31–34 (quotation omitted). Despite the reports from Z.G.'s parents, teacher, and Julie Rowe, no one at PCPS ever held a formal meeting to identify or evaluate Z.G.'s eligibility for special educational services. Id. ¶ 36.

In the summer of 2015, Crystal Dixon replaced Principal Potter as the principal. See id. ¶ 37. On August 5, 2015, Principal Dixon emailed C.G. to inform her that the school did not have any documentation showing Z.G.'s need to ride the Exceptional Children's bus. Id. ¶ 38. While Z.G. was apparently allowed to ride the Exceptional Children's bus that year, C.G. learned that Principal Dixon did not know that Z.G. had special educational needs. Id. ¶ 39.

August 24, 2015, was the first day of the new school year at PCPS. Id. ¶ 40. At 9:16 am, Principal Dixon emailed C.G. to tell her that Z.G. was "hysterical and screaming in the classroom," and that the teachers and staff could not calm him. Id. At 9:33 am, Principal Dixon emailed C.G.

4

a picture of Z.G. asleep on her office floor. Id. ¶ 41. At 1:49 pm, Principal Dixon called C.G. and told her to pick up Z.G. because "he had become unruly." Id. ¶ 42. On August 25, 2015, at 11:02 am, Principal Dixon again called C.G. and told her to pick up Z.G. Id. ¶ 44.

On August 26, 2015, at 11:10 am, Principal Dixon and Z.G.'s classroom teacher again called C.G. to pick up Z.G. Id. at ¶ 46. When C.G. arrived, she learned that on August 24, 25, and 26, 2015, Z.G. had run into the parking lot, apparently attempting to flee the school. Id. ¶ 47. Principal Dixon believed that Z.G. "was trying to harm himself by running out into the school parking lot," and placed Z.G. in "'therapeudic' holds" each time he tried to run. Id. ¶ 48. C.G. also learned during this conversation that no one had prepared a "504 Plan" for Z.G. Id. ¶ 50. Superintendent Jackson "offer[ed] to drive C.G. and Z.G. to the hospital and C.G. decline[d] that invitation." Id. at ¶ 49. A Pamlico County Sheriff's deputy then arrived and "forced Z.G. into the rear of the patrol car" and took him to a hospital in New Bern without C.G.'s consent. Id. ¶¶ 52–53.

At the hospital, the New Bern Police Department involuntarily committed Z.G., the hospital refused to release Z.G. to C.G., and a physician gave Z.G. Ativan without C.G.'s consent. Id. ¶¶ 54–55. Z.G. remained at the hospital for two days "against his and his mother's will." Id. ¶ 56. On August 27, 2015, a Craven County Sheriff's deputy took Z.G. to a hospital in Raleigh, refused C.G.'s request to ride along, and did not put Z.G. in a booster seat. Id. ¶¶ 57–58. After C.G. called the Craven County Sheriff to complain, Z.G. was placed in a booster seat and allowed to ride with C.G. in a deputy's vehicle, although Z.G. "complained of headaches and vomit[ed] several times" during the drive. Id. ¶¶ 59–60. On August 28, 2015, a physician at the Raleigh hospital diagnosed Z.G. as autistic, and stated that Z.G. "did not need to be involuntarily committed." Id. ¶ 61. On September 2, 2015, Jackson told C.G. that Z.G. could not return to school "until he received a risk assessment." Id. ¶ 66.

5

On September 4, 2015, a meeting was held to discuss Z.G.'s section 504 Accommodation Plan ("504 Plan") and his initial Individualized Education Program ("IEP"). Id. ¶ 68; see 20 U.S.C. § 1414(d) (requiring schools to prepare a written IEP for each disabled student, describing the course of the student's education and accommodations of the student's disabilities). At the meeting, Jackson told C.G. "that Z.G. cannot return to school until a new risk assessment is completed because the one from [the Raleigh hospital] says that Z.G. is at 'moderate risk' of harming himself." Id. ¶ 68. In the meantime, Z.G. stayed home. Id. ¶ 69. The school developed a 504 Plan that did not identify Z.G. as having Autism or an Autism Spectrum Disorder. See id. ¶ 70. The 504 Plan provided that Z.G. would have the support of a teacher's assistant all day, would be allowed to remove himself to a "Sensory Choice" room to avoid overstimulation, would be shown a calming review of his daily schedule each day with his teacher, would be excused from regular testing, and would be given extended time and a separate room for testing. Id. ¶ 71.

On September 8, 2015, a pediatric psychiatrist that C.G. and J.G. retained completed a risk assessment for Z.G. and found that Z.G. presented "little risk to himself or others." Id. ¶ 72. Z.G. was not allowed to return to regular activities right away, however. He could return to school only after regular school hours, at which time he would meet with his teacher. Id. ¶ 73. An unnamed person told J.G. that Z.G. would not be able to return during the regular school day until Jackson had spoken to the doctor at the Raleigh hospital who had suggested that Z.G. posed a risk of harming himself. Id. On September 9, 2015, Jackson emailed C.G. to say that Z.G. "should not be allowed to attend school" until he had several positive meetings with his teacher after school. Id. ¶ 74.

On September 10, 2015, Z.G. came to the school for an evaluation by Julie Rowe. Id. ¶ 78. Shortly after J.G. left Z.G., an unnamed person called C.G. and J.G. and told them to pick up Z.G. "because he was 'out of control.'" Id. Later that day, and again on September 11, 2015, Jackson and

6

Z.G.'s parents met to amend Z.G.'s 504 Plan. Id. ¶¶ 79–80. At the meeting, Jackson said she lacked sufficient information to determine whether Z.G. was eligible for special educational services under the IDEA. Id. ¶ 80. The amended 504 Plan required "maximum supervision" for Z.G. and provided that a school resource officer would be called if Z.G.'s behavior escalated. Id. ¶ 81.

On September 11, 2015, PCPS celebrated Grandparent's Day, but ZG was excluded from Grandparent's Day activities. Id. ¶ 82–83.

On September 14, 2015, the Exceptional Children's bus driver did not allow Z.G. to sit with his siblings, who normally rode with Z.G. to calm him. Id. at ¶ 86. The bus driver allegedly did so to "intentionally trigger[] an anxiety attack," and removed Z.G. and his siblings from the bus. Id. ¶ 88. Z.G.'s parents picked up the three children from the school. Id.

On September 15, 2015, Z.G. was disciplined for "talking loudly in the hallway after being told to be quiet." Id. ¶ 89. The incident escalated, and Z.G. again attempted to flee the school. Id. ¶ 90. Principal Dixon and a teacher's assistant managed to corner Z.G. before he could escape the building. Id. ¶ 91. "Z.G. threatened to 'slap' Principal Dixon and allegedly threw a wooden stick at" the teacher's assistant. Id. A school resource responded to a call and detained Z.G. Id. ¶¶ 89, 91. Z.G. was suspended for two days. Id. ¶ 92. On September 18, 2015, Z.G. was allowed to return, but was required to spend the school day in the Sensory Choice room, away from other students. Id. ¶¶ 92–93, 95.

On November 10, 2015, C.G. observed bruises on Z.G.'s torso. Id. ¶ 96. Z.G. said "Mr. King" had pushed him. Id. ¶ 97. C.G. took Z.G. to a physician, who treated Z.G.'s injuries and suggested that they were consistent with abuse. Id. ¶¶ 98–99. Outside of C.G.'s presence, Z.G. told the physician that "Mr. King had hurt him in the past, but Mr. Greene had hurt [him] recently." Id.

7

¶ 100. Plaintiffs believe that Mr. Greene is a behavior specialist who works for the Board. See id. ¶ 101.

On November 10, 2015, Principal Dixon "caused a sheriff's deputy to go to J.G.'s job at the local community college and serve the 'Psychological Evaluation' of Z.G." prepared by Julie Rowe. Id. ¶ 108. A meeting was scheduled for November 12, 2015, to discuss the results, but the school's representatives "refused to . . . discuss the evaluation report with C.G. and J.G.'s attorney present." Id. ¶ 109. Also on November 12, 2015, Deputy Bailey again attempted to deliver Julie Rowe's evaluation to J.G., first by going to the community college where J.G. worked "and asking several of his coworkers where he was and giving them the impression that J.G. had committed a criminal offense." Id. ¶ 110. When Deputy Bailey could not find J.G. at the community college, he met J.G. at a McDonalds and delivered the evaluation. Id. On December 3, 2015, Deputy Bailey delivered a note to J.G. "from the school" regarding Z.G.'s absences from school, even though Z.G.'s sister had received a similar note by mail, rather than by hand delivery. Id. ¶ 111.

On November 17, 2015, plaintiffs filed this action [D.E. 1]. On April 29, 2016, plaintiffs filed their first amended complaint, which contains twelve counts [D.E. 25]. Count one alleges violations of the IDEA. Count two alleges violations of the ADA. Count three alleges violations of the Rehabilitation Act. Count four alleges retaliation against plaintiffs for conduct protected under the ADA and Rehabilitation Act. Count five alleges that defendants deprived Z.G. of his constitutional right to liberty in violation of section 1983. Counts six through eight allege negligent infliction of emotional distress upon Z.G., C.G., and J.G., respectively. Count nine alleges that defendants falsely imprisoned Z.G. Count ten alleges a battery of Z.G. Count eleven seeks a permanent injunction precluding defendants from physically restraining Z.G. or placing him in the Sensory Choice room for more than 15 minutes at a time. Count twelve seeks a permanent

**8**

injunction precluding defendants from "serving documents on [them] in a manner contrary to the standard process within the school system or by certified mail." Am. Compl. ¶ 176. On May 13, 2016, the Board and Jackson moved to dismiss the first amended complaint [D.E. 28]. On June 2, 2016, plaintiffs responded to the Board and Jackson's motion [D.E. 34]. On June 13, 2016, the Board and Jackson replied to plaintiffs' response [D.E. 35]. On June 28, 2016, plaintiffs responded to the Board and Jackson's reply [D.E. 38].

On July 6, 2016, the Board and Jackson moved to strike plaintiffs' response to their reply [D.E. 39] and filed a memorandum in support [D.E. 40]. On July 7, 2016, plaintiffs moved for leave to amend their complaint a second time [D.E. 41]. On July 11, 2016, Davis responded in opposition to plaintiffs' motion to file a second amended complaint [D.E. 42]. On July 26, 2016, plaintiffs responded in opposition to the motion to strike their response brief [D.E. 43]. On July 28, 2016, the Board and Jackson responded in opposition to plaintiffs' motion to file a second amended complaint [D.E. 44]. On August 9, 2016, the Board and Jackson replied to plaintiffs' response regarding the motion to strike [D.E. 45].

## II.

As for the Board and Jackson's motion to strike, the filing at issue was a surreply brief in opposition to the Board and Jackson's motion to dismiss. Plaintiffs did not seek leave of this court before filing the surreply. "The local rules do not permit a party to file a surreply without leave of court . . . ." Gilchrist v. Wells Fargo Bank, Nat'l Ass'n, No. 4:12-CV-118-D, 2014 WL 4105071, at *5 (E.D.N.C. Aug. 19, 2014) (unpublished); see Spivey v. Research Triangle Reg'l Pub. Transp. Auth., No. 5:14-CV-44-FL, 2015 WL 5513320, at *10 (E.D.N.C. Aug. 10, 2015) (unpublished). Accordingly, the court grants the motion to strike the surreply.

As for the Board and Jackson's motions to dismiss plaintiffs' claims under Rule 12(b)(1) and (2) of the Federal Rules of Civil Procedure, they argue that plaintiffs failed to exhaust their administrative remedies before filing this action and that defendants are entitled to governmental immunity. Initially, the court addresses the alleged failure to exhaust administrative remedies.

A motion to dismiss under Rule 12(b)(1) tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); see Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 453 (4th Cir. 2012); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co., 523 U.S. at 104; see Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

In considering a motion to dismiss for lack of subject-matter jurisdiction, the court may consider evidence outside the pleadings without converting the motion into one for summary judgment. See, e.g., Richmond, Fredericksburg & Potomac R.R., 945 F.2d at 768. However, if a defendant "contend[s] that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," then "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982); see Kerns v. United States, 585 F.3d 187, 192–93 (4th Cir. 2009). Thus, "when a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction," a court must "assume the truthfulness of the facts alleged" in the complaint and any attached materials. Kerns, 585 F.3d at 193; see Fed. R. Civ. P. 10(c).

The IDEA grants plaintiffs the right to file a civil action in a federal court if they are "aggrieved by the findings and decision" of either an "impartial due process hearing" conducted by a state or local agency, or a hearing to dispute certain formal decisions regarding a student's placement. 20 U.S.C. § 1415(f)(1)(A), (i)(2)(A), (k)(3)(A). "The district court's jurisdiction under the IDEA is limited to review of the final findings and decision" of the state decisionmaker. M.E. ex rel. C.E. v. Buncombe Cty. Bd. of Educ., 72 F. App'x 940, 941 (4th Cir. 2003) (per curiam) (unpublished) (quotation omitted); see E.L. ex rel. Lorsson v. Chapel Hill–Carrboro Bd. of Educ., 773 F.3d 509, 514–15 (4th Cir. 2014); MM ex rel. DM v. Sch. Dist. of Greenville Cty., 303 F.3d 523, 536 (4th Cir. 2002).

North Carolina offers a two-tiered administrative review process for IDEA claims. First, an aggrieved party may file a petition for a due-process hearing with the Office of Administrative Hearings, which appoints administrative law judges to conduct hearings. N.C. Gen. Stat. § 115C-109.6(a), (j); E.L. ex rel. Lorsson, 733 F.3d at 513. Second, a party may appeal the decisions of an administrative law judge to a Review Officer that the State Board of Education appoints. N.C. Gen. Stat. § 115C-109.9(a). Parties must obtain the findings or decision of the Review Officer to exhaust their administrative remedies. E.L. ex rel. Lorsson, 733 F.3d at 513–15.

Plaintiffs claim that the Board and Jackson violated the IDEA

> by failing to identify, locate, and evaluate Z.G. as a child with a disability . . . . by failing to adequately consider evaluative data provided by Plaintiff C.G. that clearly indicated Z.G. was diagnosed with a documented disabilit[y] . . . . by failing to follow procedural guidelines requiring a determination within ninety (90) days of Z.G.'s eligibility under the IDEA . . . . by implementing blanket policies whereby Z.G. was allegedly served as "homebound" without consideration of his diagnosed disabilities or developing a written plan for properly serving him in light of his disabilities . . . . by failing to educate Z.G. in the least restrictive environment and requiring Z.G. to spend the majority of his seat time in the Sensory Choice room . . . . [and] by requiring C.G. and J.G. to pay Julie Rowe to perform a psychological evaluation of Z.G.

11

Am. Compl. ¶¶ 116–21. On September 26, 2015, plaintiffs filed a petition with the Office of Administrative Hearings for a due-process hearing to address these concerns, but voluntarily withdrew their petition on November 17, 2015. [D.E. 28-1] (due-process petition); [D.E. 28-3] (notice of voluntary dismissal of due-process petition). Plaintiffs object to defendants' introduction of exhibits concerning the petition, and argue that defendants are "attempt[ing] to convert the motion to dismiss into a motion for summary judgment." [D.E. 34] 5 n.1.

Plaintiffs bear the burden of establishing subject-matter jurisdiction, and a court may consider evidence from either party to make that determination. See Richmond, Fredericksburg & Potomac R.R., 945 F.2d at 768. It is unnecessary for the court to consider any evidence however, because plaintiffs must plead and prove the basis of subject-matter jurisdiction. See Steel Co., 523 U.S. at 104; Evans, 166 F.3d at 647; Richmond, Fredericksburg & Potomac R.R., 945 F.2d at 768. Plaintiffs' first amended complaint does not allege that plaintiffs ever obtained any final findings or decision from the state administrative process that this court could review. Alternatively, defendants' exhibits demonstrate that, in fact, no final finding or decision was ever reached because plaintiffs voluntarily withdrew their petition for a due-process hearing. [D.E. 28-3]. This evidence provides an alternative basis, but not a necessary one, for the court to conclude that plaintiffs have failed to exhaust their administrative remedies.

In response, plaintiffs argue that they were not required to exhaust state administrative remedies because to do so would have been futile. Absent exhaustion, a court may maintain jurisdiction over an IDEA claim only if one of "three narrow exceptions to th[e] exhaustion requirement" applies: "(1) when the administrative process would have been futile; (2) when a school board failed to give parents proper notification of their administrative rights; or (3) when administrative exhaustion would have worked severe harm upon a disabled child." MM ex rel. DM,

303 F.3d at 536. Plaintiffs argue that the first exception applies. As for plaintiffs' IDEA claim, plaintiffs argue that the administrative process would have been futile because they have alleged "ongoing injuries that cannot be redressed through the administrative process." [D.E. 34] 5. The purportedly ongoing injuries, however, are the methods school employees used to restrain Z.G. Id.

State administrative law judges have broad authority under the IDEA to direct appropriate changes to Z.G.'s educational program, including the methods used to accommodate disruptive manifestations of his disabilities. See 20 U.S.C. § 1415(b). To the extent plaintiffs' allegations constitute claims under the IDEA, they relate to the discipline or safety of a student, the ability of staff to respond to manifestations of a student's disability, or maintaining order in the educational setting, and this court may consider them only by reviewing the final findings or decision of the state administrative process. Moreover, plaintiffs' request for damages does not allow plaintiffs to avoid the administrative exhaustion requirement. See, e.g., Covington v. Knox Cty. Sch. Sys., 205 F.3d 912, 916 (6th Cir. 2000); Sellers v. Sch. Bd. of the City of Manassas, 141 F.3d 524, 527 (4th Cir. 1998); Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68, 98 F.3d 989, 993 (7th Cir. 1996); N.B. v. Alachua Cty. Sch. Bd., 84 F.3d 1376, 1379 (11th Cir. 1996); cf. Padilla v. Sch. Dist. No. 1 in the City and Cty. of Denver, Colo., 233 F.3d 1268, 1274 (10th Cir. 2000).

A plaintiff also must exhaust the IDEA's administrative remedies before filing suit under section 504, the ADA, or any other federal law protecting the rights of children with disabilities if that action "seek[s] relief that is also available under" the IDEA. See 20 U.S.C. § 1415(l). Thus, the IDEA's exhaustion requirement covers numerous education-related claims, because the IDEA's administrative procedures allow parents "to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(6). The Fourth Circuit has not

elaborated on the test used to determine whether a plaintiff "seek[s] relief that is also available under" section 1415(l) of the IDEA, but other circuits have.

The Third, Seventh, and Tenth circuits have adopted an "injury-centered" test, under which plaintiffs may be excused from the exhaustion requirement only if they have "alleged injuries that cannot be redressed to any degree by the IDEA's administrative procedure and remedies." McCormick v. Waukegan Sch. Dist. #60, 374 F.3d 564, 568 (7th Cir. 2004) (quotation omitted); see Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266, 272 (3d Cir. 2014) (holding that section 1415(l) "bars plaintiffs from circumventing the IDEA's exhaustion requirement by taking claims that could have been brought under [the] IDEA and repackaging them as claims under some other statute" (alteration omitted)); Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1066–67 (10th Cir. 2002) ("If the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem." (quotation omitted)). The injury-centered test asks whether the alleged acts "have both an educational source and an adverse educational consequence." Cudjoe, 297 F.3d at 1067 (quotation omitted).

Plaintiffs' claims under other federal laws are subject to the exhaustion requirement under the injury-centered test because the IDEA's far-reaching administrative procedure and remedies could redress them to some degree. See 20 U.S.C. § 1415(b). Plaintiffs' ADA claim in count two involves the details of Z.G.'s classroom situation and the ability of the school to properly accommodate his disability. See Am. Compl. ¶¶ 123–28. Plaintiffs' section 504 claim in count three likewise challenges Z.G.'s placement in an educational program that is not the "le[ast] confining program that satisfies his educational needs." See id. ¶¶ 129–134. The section 1983 claim in count five contests the conditions of Z.G.'s educational situation, Z.G.'s inability to participate in "regular

14

education activities," and the school's response to the manifestations of Z.G.'s disabilities. See id. ¶¶ 140–43. Under the injury-centered test, each of these claims have both an educational source and educational consequences.

Plaintiffs' retaliation claim for the exercise of his rights under the IDEA in count four "seek[s] relief that is also available under the IDEA" and is therefore subject to the exhaustion requirement. See, e.g., Batchelor, 759 F.3d at 273–74; M.T.V. v. DeKalb Cty. Sch. Dist., 446 F.3d 1153, 1158–59 (11th Cir. 2006); Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir. 2000); Singletary v. Cumberland Cty. Schs., No. 5:12-CV-744-FL, 2015 WL 1125088, at *7 (E.D.N.C. Mar. 12, 2015) (unpublished). In count four, plaintiffs allege that the Board and Jackson retaliated against Z.G., his siblings, and his parents for exercising "their statutory rights for their minor, public school going child, Z.G. in September of 2015." Am. Compl. ¶ 136. Although plaintiffs' acts in September 2015 did involve the exercise of rights under section 504 and the ADA, the first amended complaint also shows that the conduct leading to the alleged retaliation involved plaintiffs exercising their IDEA rights by disputing Z.G.'s IEP. See id. ¶¶ 68, 79–81. Furthermore, the Board and Jackson's allegedly retaliatory acts were school disciplinary decisions and delivering "special education related papers" to Z.G.'s parents, which the school was required to deliver under the IDEA's notice provisions. Id. ¶ 135; see 20 U.S.C. §§ 1414 (b)(1), 1415(b)(3)-(4), (c). This retaliation claim has both an educational source and educational consequences. The same reasoning applies to plaintiffs' request in count twelve for an injunction protecting C.G. and J.G. against further retaliatory acts. See Am. Compl. ¶¶ 175–79. Therefore, under the injury-centered test, counts four and twelve seek relief that is available under the IDEA, and this court would not be able to exercise jurisdiction over the claims unless plaintiffs first demonstrate that they have exhausted their administrative remedies.

15

Under the Ninth Circuit's "relief-centered" approach, a plaintiff must exhaust the state's administrative procedures before bringing a non-IDEA claim in three circumstances. M.M., 767 F.3d at 861; C.O. v. Portland Pub. Schs., 679 F.3d 1162, 1167–68 (9th Cir. 2012); Payne v. Peninsula Sch. Dist., 653 F.3d 863, 875 (9th Cir. 2011) overruled on other grounds by Albino v. Baca, 747 F.3d 1162 (9th Cir. 2014). First, a plaintiff must exhaust remedies before "seek[ing] an IDEA remedy or its functional equivalent," such as a disabled student's ADA challenge to the school's accommodation of his disability that "seeks damages for the costs of a private school education." Payne, 653 F.3d at 875. "Second, the IDEA requires exhaustion in cases where a plaintiff seeks prospective injunctive relief to alter an IEP or the educational placement of a disabled student." Id. Third, a plaintiff must exhaust administrative remedies before bringing a claim that arises "under either the IDEA . . . or its substantive standards," such as when "a [section] 504 claim is premised on a violation of the IDEA." Id. The relief-centered approach "start[s] by looking at a complaint's prayer for relief and determine[s] whether the relief sought is also available under the IDEA." Id. A court, however, must still analyze each claim individually to determine whether that claim is subject to the exhaustion requirements. See id. at 881.

Under the relief-centered approach, a plaintiff still may not "avoid the IDEA's exhaustion requirement by limiting a prayer for relief to money damages." Id. at 877 (quotation omitted). When a claim seeks monetary damages, the question is whether the plaintiff seeks monetary damages as a substitute for the procedures and remedies under the IDEA, or instead for an injury that cannot be redressed through the IDEA. Id. For example, compensatory educational services are a form of relief available under the IDEA, and plaintiffs may not avoid the IDEA's exhaustion requirement by seeking monetary relief to cover the cost of services the school could be forced to provide under the IDEA. Id. Moreover, the Ninth Circuit's instruction that a party may not skirt exhaustion

16

requirements by "limiting a prayer for relief to money damages" suggests that the relief-centered approach looks at all forms of relief sought for a particular count, and requires exhaustion if any of those forms of relief are available under the IDEA. Id. (emphasis added).

The Ninth Circuit's approach makes sense. The exhaustion requirement applies to "civil action[s] . . . seeking relief that is also available under the IDEA," not to actions that only seek relief that is also available under the IDEA. See 20 U.S.C. § 1415(l). Thus, the court assumes without deciding that the relief-centered approach applies for determining whether exhaustion is required under the IDEA. In doing so, the court recognizes that the injury-centered test may more effectively ensure that educational matters are first addressed by state and local agencies with educational expertise. Nevertheless, the language of 20 U.S.C. § 1415 focuses on whether a plaintiff's action "seek[s] relief that is also available under the IDEA." 20 U.S.C. § 1415(l). The relief-centered approach maintains the court's focus on the statutory language, while still ensuring that plaintiffs may not artfully plead around the IDEA's administrative-exhaustion requirements.

Plaintiffs' prayer for relief requests (1) compensatory education services and reimbursement for educational services that C.G. and J.G. provided to Z.G. during the time they allege the school failed to do so; (2) reimbursement for various expenses, educational, psychological, and otherwise, plaintiffs incurred as a result of defendants' alleged violations; (3) injunctive relief prohibiting defendants from violating plaintiffs' rights in the future; (4) compensatory damages "for each of their individual injuries and losses"; (5) various forms of declaratory relief; (6) punitive damages; and (7) litigation expenses. Am. Compl. at 34–36 (prayer for relief). That plaintiffs have broadly sought "compensatory damages . . . for each of their individual injuries and losses" does not suffice to avoid section 1415(l)'s exhaustion requirement. See Payne, 653 F.3d at 877. Rather, the court must

17

examine each claim and determine whether the remedies plaintiffs seek are wholly separate from IDEA remedies, are identical to IDEA remedies, or are essentially substitutes for IDEA remedies.

Under the relief-centered approach, plaintiffs' ADA claim in count two is subject to the exhaustion requirement because that count challenges the Board and Jackson's failure to accommodate Z.G.'s educational needs arising from his disability. See Am. Compl. ¶¶ 123–28. If this challenge seeks any form of relief not directly available under the IDEA, it would be the request for "reimbursement" for various educational expenses plaintiffs incurred when the Board allegedly failed to provide Z.G. with adequate educational services. See Am. Compl. at 34. The IDEA's administrative remedies include compensatory educational services, and plaintiffs may not circumvent the IDEA's administrative procedures by seeking money instead of actual services. Payne, 653 F.3d at 877. The only other plausible forms of relief sought under count two are the various forms of injunctive relief that would prospectively alter Z.G.'s educational placement and declaratory relief that the Board and Jackson violated the ADA. Therefore, count two seeks only relief available under the IDEA.

Plaintiffs' section 504 claim in count three challenges the school defendants' failure to place Z.G. in "the most integrated setting appropriate," to "provide Z.G. a less confining program that satisfies his educational needs," and "to properly evaluate Z.G.'s disabilities, design a plan to address the disabilities that may create an impediment to Z.G.'s ability to access the education being provided in the classroom, and excluding Z.G. from the regular classroom because of the manifestations of his disabilities." Am. Compl. ¶¶ 131–33. The analysis for this claim replicates the analysis for plaintiffs' ADA claim. Except for compensatory educational services, plaintiffs seek only declaratory relief and injunctive relief that would prospectively alter Z.G.'s educational placement. Id. at 34–36. Thus, count three seeks only relief that is available under the IDEA.

18

Plaintiffs' retaliation claim in count four primarily challenges school disciplinary actions taken against Z.G. and his siblings and defendants' failure to allow Z.G. to attend certain school activities. Id. ¶¶ 135–39. Any compensatory damages sought for this claim would merely be in lieu of the educational services to which plaintiffs were entitled under the IDEA. See Payne, 653 F.3d at 877. The injunction plaintiffs seek as to this count would be prospective and alter the details of Z.G.'s educational placement. Count four also challenges the school defendants' use of law enforcement to deliver "special education related papers," specifically papers related to a psychologist's evaluation. Am. Compl. ¶¶ 108, 110, 137(e). This challenge functionally equals an alleged procedural defect under the IDEA's notice provisions, which require delivery of such educational evaluations. See 20 U.S.C. §§ 1414 (b)(1), 1415(b)(3), (b)(4), (c); see also M.M., 767 F.3d at 861 (holding that, under the relief-centered approach, a claim that "is the functional equivalent of a procedural defect claim under the IDEA" must be exhausted).

The injunction plaintiffs request in count eleven seeks an altered educational placement for Z.G., which must be exhausted under the second prong of Payne. See Payne, 653 F.3d at 875. The request for an injunction in count twelve, however, requests that the court limit defendants' ability to serve any documents on C.G. or J.G. Am. Compl. ¶ 176. Because this request would enjoin conduct far beyond the scope of the IDEA's administrative remedies, the court has jurisdiction under the relief-centered approach to consider it without exhaustion.

Plaintiffs' section 1983 claim for a deprivation of liberty in count five plausibly requests, in part, relief that is not available under the IDEA. See id. ¶¶ 140–43, 156–59. The section 1983 claim primarily challenges Z.G.'s placement in the Sensory Choice room and his involuntary commitment by the New Bern Police Department. Id. To the extent these claims relate to Z.G.'s placement in the Sensory Choice room, such claims are inextricably linked to IDEA claims. Any monetary relief

would merely be in lieu of an alternate educational placement, and any injunctive relief would prospectively alter Z.G.'s classroom placement. See Payne, 653 F.3d at 877. But to the extent these claims relate to Z.G.'s transportation to the hospital and his commitment, monetary relief is available for that claim in the form of compensatory damages which would not duplicate relief under the IDEA. Thus, under the relief-centered approach, the court retains jurisdiction over the part of count five that addresses Z.G.'s involuntary commitment.

### III.

As for defendants' motions to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," the motions test the legal and factual sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). The court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). The court need not, however, accept as true a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Id. In evaluating a motion to dismiss, the court looks to the complaint and materials attached to it. Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).

As for the federal claims, the court has jurisdiction over the claims against the Board and Jackson only as to the section 1983 claim arising form Z.G.'s involuntary commitment in count five

20

and the request for an injunction in count twelve. Davis and "Deputy Bailey" are named only in counts five, eleven, and twelve. See Am. Compl. ¶¶ 115–79; see also 2d Am. Compl. [D.E. 41-1] ¶¶ 118–85. Count five, a section 1983 claim, accuses Davis, "Deputy Bailey," the Board, and Jackson with restraining Z.G. in violation of his constitutional right to liberty by having him civilly committed. Am. Compl. ¶¶ 140–43. Counts eleven and twelve seek an injunction against further deprivations of plaintiffs' rights. Id. ¶¶ 170–79.

Plaintiffs have sued the Board and Jackson, the Board's superintendent, in her official capacity. See id. ¶¶ 7–9. Likewise, plaintiffs have sued Davis and "Deputy Bailey" in their official capacities as officers of the Pamlico County Sheriff's Office. Id. A claim against a public official sued in his official capacity is "essentially a claim against" the government entity the official represents. Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004); see Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006). The section 1983 claims against "Deputy Bailey" and Jackson are therefore dismissed as duplicative. See McDonald v. Suggs, No. 5:07-CV-339-D, 2008 WL 2129860, *4 (E.D.N.C. May 20, 2008) (unpublished).

Municipal entities may not be held liable solely because they have employed a tortfeasor. Rather, when a municipal entity is sued—directly or in an official-capacity suit—the plaintiff must show that a "policy or custom" attributable to the municipal entity caused the violation of the plaintiffs' federally protected rights. See, e.g., Hafer v. Melo, 502 U.S. 21, 25 (1991); Graham, 473 U.S. at 166; Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690–94 (1978); King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 469–70 (4th Cir. 2013); Smith v. Atkins, 777 F. Supp. 2d 955, 966–67 (E.D.N.C. 2011). A violation results from a municipality's "policy or custom" if the violation resulted from "a policy

21

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or a governmental "custom." Monell, 436 U.S. at 690–91; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988). Liability may also result from deliberate indifference in training or hiring. See Connick v. Thompson, 563 U.S. 51, 61 (2011); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997); Smith, 777 F. Supp. 2d at 966–67. A single act of a municipal official may result in municipal liability if that official has final policymaking authority with respect to the action ordered. See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); Lytle v. Doyle, 326 F.3d 463, 472 (4th Cir. 2003); Riddick v. School Bd. of the City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000).

Davis is sued in his official capacity; therefore, the claims against him are essentially suits against the Pamlico County Sheriff's Office, the governmental agency he represents. See Graham, 473 U.S. at 165–66; Am. Compl. ¶ 10. Plaintiffs' first amended complaint does not mention any policy or custom of the Pamlico County Sheriff's Office, much less one concerning Z.G.'s involuntary commitment. Rather, the first amended complaint alleges that an individual sheriff's deputy "arrived at the school saying he was ready to transport Z.G. to the hospital" after Z.G. had attempted to harm himself. Am. Compl. ¶ 52. After the sheriff's deputy took Z.G. to the hospital, the New Bern Police Department, not the Pamlico County Sheriff's Office, "involuntarily committed" Z.G. Id. ¶ 54. To the extent that the involuntary commitment deprived Z.G. of his liberty, the New Bern Police Department caused that deprivation, not a policy or custom of the Pamlico County Sheriff's Office or the Board. To the extent Z.G. was deprived of his liberty when transported to the hospital, no allegations suggest that the sheriff's deputy acted according to an official policy or custom, as opposed to making an individual judgment based on the circumstances that confronted him.

Likewise, the first amended complaint does not allege any policy or custom on the part of the Board that led to Z.G.'s transportation to the hospital. Rather, taken in the light most favorable to plaintiffs, the first amended complaint shows that after an incident in which Z.G. had attempted to escape the school and harm himself by running into the school parking lot, school officials "direct[ed]" a sheriff's deputy to take Z.G. to the hospital. Am. Compl. ¶¶ 47–53. Plaintiffs have not argued that Jackson, as the Superintendent, was an official policymaker with respect to the single act of directing a sheriff's deputy to transport Z.G., much less plausibly alleged in their first amended complaint that Jackson occupied such a position. See Argyropoulos v. City of Alton, 539 F.3d 724, 740 (7th Cir. 2008) (holding that the plaintiff "needed to establish, by reference to applicable state or local law" that a municipal official "was the final policy maker with respect to" the challenged conduct). Although a school superintendent likely has some policymaking authority, plaintiffs have not plausibly alleged that Jackson had the authority to determine when a student is taken to the hospital, or what the student's course of treatment should be once the student arrives. Nor have plaintiffs cited any state or municipal law suggesting that Jackson had such authority.

Alternatively, even if plaintiffs plausibly alleged that Z.G. was transported to the hospital and involuntarily committed as a result of one of defendants' policies or customs, they have not plausibly alleged that this conduct violated plaintiffs' constitutional rights. Plaintiffs allege that defendants' acts violated Z.G.'s "right to personal liberty without due process of law in violation of the Fourteenth Amendment." Am. Compl. ¶ 141. Defendants' only involvement with Z.G.'s commitment was transporting him to the hospital after he attempted to harm himself and others. When executive action, rather than a legislative enactment, is challenged under the Due Process Clause, the court must address as a "threshold question" whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." City of

23

Sacramento v. Lewis, 523 U.S. 833, 846–47 & n.8 (1998); see Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 80 (4th Cir. 2016); Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (en banc). Even intentional conduct will not meet the conscience-shocking standard unless it was "intended to injure in some way unjustifiable by any government interest." Lewis, 523 U.S. at 849; see Hawkins, 195 F.3d at 342. Plaintiffs do not allege, and the allegations in the amended complaint do not suggest, that the defendants intended to injure plaintiffs by taking Z.G. to the hospital. Moreover, taking a child to the hospital immediately after that child attempted to harm himself and others does not shock the contemporary conscience, and it was justified by the government interest in the safety of Z.G., other students, and school personnel. See, e.g., Jacobs v. Clark Cty. Sch. Dist., 526 F.3d 419, 435 (9th Cir. 2008); Blau v. Fort Thomas Public Sch. Dist., 401 F.3d 381, 391–92 (6th Cir. 2005).

As for plaintiffs' request for injunctive relief in count twelve, it is unclear whether plaintiffs seek a preliminary or permanent injunction. Compare Am. Compl. at 1 (captioned as a "request for preliminary and permanent injunction"), with Am. Compl. ¶¶ 170–79 (seeking only a "permanent injunction"). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits of the underlying claim; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) that an injunction would be in the public interest. See Winter v. Nat'l Res. Def. Council, Inc., 515 U.S. 7, 20–23 (2008); Cantley v. W.V. Reg'l Jail and Corr. Facility Auth., 771 F.3d 201, 207 (4th Cir. 2014). A plaintiff seeking a permanent injunction "must show (1) irreparable injury, (2) [that] remedies at law are inadequate to compensate for that injury, (3) [that] the balance of hardships between the plaintiff and defendant warrants a remedy, and (4) [that] an injunction would not disserve the public interest." Raub v. Campbell, 785 F.3d 876, 885–86 (4th Cir. 2015) (quotation omitted); see City of Los

Angeles v. Lyons, 461 U.S. 95, 111 (1983). "Where a [section] 1983 plaintiff also seeks injunctive relief, it will not be granted absent the plaintiff's showing that there is a real or immediate threat that he will be wronged again in a similar way." Raub, 785 F.3d at 885–86 (quotation and alterations omitted). "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury" which justifies injunctive relief under section 1983. Simmons v. Poe, 47 F.3d 1370, 1382 (4th Cir. 1995) (quotation omitted).

Plaintiffs have not plausibly alleged anything to justify injunctive relief. They have not plausibly alleged a likelihood of success on the merits or any irreparable harm that would be caused by the hand-delivery of documents. Moreover, plaintiffs have not alleged that any similar events are likely to reoccur. Plaintiffs' threadbare allegations do not warrant the "extreme remedy" of injunctive relief. See Simmons, 47 F.3d at 1382. Because plaintiffs have failed to state a claim upon which relief may be granted under section 1983, and have failed to plead a claim that entitles them to injunctive relief, the court dismisses those claims.

Having determined that the court lacks jurisdiction to decide all of plaintiffs' federal claims except those in counts five and twelve, and having dismissed counts five and twelve for failure to state a claim, the court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims in counts six through ten. See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 394 (4th Cir. 2012); Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995).

IV.

As for plaintiffs' motion to amend their complaint, a party generally may amend its complaint once as a matter of course. Fed. R. Civ. P. 15(a)(1). On April 29, 2016, plaintiffs did so [D.E. 25].

25

Further amendments are allowed "only with the opposing party's written consent or the court's leave," although "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A district court may deny leave to amend a complaint if amendment would be futile. Foman v. Davis, 371 U.S. 178, 182 (1962); Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 439 (4th Cir. 2011). If the court would lack subject-matter jurisdiction over a plaintiff's amended complaint, the amendment would be futile. See, e.g., Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc); Johnson v. Oroweat Foods Co., 785 F.2d 503, 509–10 (4th Cir. 1986); Harris v. Army Review Bd. Agency, No. 4:15-CV-122-D, 2016 WL 4578074, at *5 (E.D.N.C. Aug. 31, 2016) (unpublished). An amendment also is futile if the amended complaint would fail to state a claim under Rule 12(b)(6). See, e.g., Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011); United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 375–76 (4th Cir. 2008).

Plaintiffs seek leave to amend their complaint "to properly identify the deputy sheriff as a defendant in this matter." [D.E. 41] ¶ 6. The proposed amendment would be futile. The first amended complaint listed "Deputy Bailey" as a defendant in his official capacity. See Am. Compl. at 1 (case caption). Plaintiffs are now aware that the individual in question is Nicholas Blayney, a Pamlico County Sheriff's Deputy. [D.E. 41] ¶ 8. Blayney's name, however, does not change any relevant analysis. Here, plaintiffs sued the Sheriff's Office defendants in their official capacities, and the suit against Deputy Blayney would be dismissed as duplicative. See Graham, 473 U.S. at 165–66; Love-Lane, 355 F.3d at 783; Ridpath, 447 F.3d at 307 n.13; McDonald, 2008 WL 2129860, at *4.

The proposed second amended complaint also adds as a defendant Superintendent Lisa Jackson in her individual capacity. [D.E. 41-1]. Although it is unclear exactly which claims

26

plaintiffs have asserted against Jackson in her official capacity, Jackson is not named in her individual capacity in counts one, two, three, or ten. Those counts reference only the acts of the Board, acting through others. See 2d. Am. Compl. ¶¶ 119–40, 166–75. Plaintiffs potentially assert claims against Jackson in counts four through nine, eleven, and twelve of their proposed second amended complaint. See id. ¶¶ 141–65, 176–85.

Count four alleges retaliation for conduct protected by the ADA and section 504. Id. ¶¶ 141–45. "[T]he ADA does not permit an action against individual defendants for retaliation for conduct protected by the ADA." Baird ex rel. Baird v. Rose, 192 F.3d 462, 472 (4th Cir. 1999). Similarly, section 504 does not permit an action against defendants in their individual capacities for retaliation for conduct protected by the Rehabilitation Act. See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303, 783 F.3d 634, 644 (7th Cir. 2015); Hiler v. Brown, 177 F.3d 542, 546 (6th Cir. 1999); Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 226 (D. Mass. 2015); Zied-Campbell v. Richman, No. 1:04-CV-0026, 2007 WL 1031399, at *18 (M.D. Pa. March 30, 2007) (unpublished); N.T. v. Espanola Pub. Schs., No. Civ 04-0415 MCA/DJS, 2005 WL 5840479, at *9 (D.N.M. May 20, 2005) (unpublished); Weyrick v. New Albany-Floyd Cty. Consol. Sch. Corp., No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793, at *19 (S.D. Ind. Dec. 23, 2004) (unpublished).

Plaintiffs' section 1983 claim in count five of their second amended complaint for a violation of Z.G.'s due-process rights essentially replicates their section 1983 claim in count five of their first amended complaint, except that it is also directed against Jackson in her individual capacity. Compare Am. Compl. ¶¶ 140–43, with 2d Am. Compl. ¶¶ 146–49. To state a claim against a public official in her individual capacity, a plaintiff must overcome the official's qualified immunity by showing that the official violated a statutory or constitutional right that was clearly established at the time of the violation. See Lane v. Franks, 134 S. Ct. 2369, 2381 (2014); Pearson v. Callahan, 555

U.S. 223, 231 (2009); Saucier v. Katz, 533 U.S. 194, 200–02 (2001); Graham v. Gagnon, 831 F.3d 176, 182 (4th Cir. 2016); Miller v. Prince George's Cty., Md., 475 F.3d 621, 626–27 (4th Cir. 2007). As discussed, plaintiffs have failed to plausibly allege that Jackson violated the Due Process Clause because her alleged actions did not "shock the contemporary conscience." Lewis, 523 U.S. at 846–47 & n.8; Kerr, 824 F.3d at 80; Hawkins, 195 F.3d at 738. Thus, plaintiffs' claim against Jackson in her individual capacity fails at the first prong of the qualified immunity analysis.

Plaintiffs' requests for injunctive relief in the second amended complaint add nothing new, and therefore fail for the same reasons already discussed. Compare Am. Compl. ¶¶ 170–79, with 2d Am. Compl. ¶¶ 176–85. Having dismissed all of plaintiffs' federal claims, the court again would decline to exercise supplemental jurisdiction over plaintiffs' state-law claims. Accordingly, plaintiffs' motion to amend their complaint is denied as futile.

V.

In sum, the court GRANTS the Board and Jackson's motion to strike [D.E. 39], GRANTS defendants' motions to dismiss [D.E. 28, 36], DISMISSES plaintiffs' federal claims, DECLINES to exercise supplemental jurisdiction over plaintiffs' state-law claims, and DENIES as futile plaintiffs' motion to amend their complaint [D.E. 41]. The clerk shall close the case.

SO ORDERED. This 3 day of February 2017.

JAMES C. DEVER III
Chief United States District Judge

28